**COMMODITY FUTURES TRADING COMMISSION, Plaintiff,**

v.

**MURRAY IRA ROSENBERG, d/b/a Pro Broker Services, Inc. (a/k/a Pro–Broker Service, Inc.), and Pro–Broker Service, Inc., Defendants.**

**Civil Action No. 97–2927.**

United States District Court, D. New Jersey.

March 1, 2000.

Robert J. Cleary, United States Attorney, Paul A. Blaine, Assistant United States Attorney, Camden, NJ, Matthew Elkan, Karen Kenmotsu, Commodity Futures Trading Commission, Washington DC, for Plaintiff, Commodity Futures Trading Commission.

Murray Ira Rosenberg, Mullica Hill, NJ, pro se.

Gary W. Stuhltrager, Deptford, NJ, for Defendant, Pro–Broker Service, Inc.

## OPINION

ORLOFSKY, District Judge.

This case requires this Court to enter the realm of commodity futures and options on futures trading as regulated by the provisions of the Commodities Exchange Act, 7 U.S.C. §§ 1 *et seq.* (1999)("CEA"). Plaintiff, Commodity Futures Trading Commission ("CFTC"), brought this civil enforcement action against Defendant Murray I. Rosenberg ("Rosenberg") for his alleged violations of the CEA, and the regulations which have been promulgated to enforce it, 17 C.F.R. §§ 1.1 *et seq.* (1999). Simply stated, the CFTC alleges that Rosenberg offered to introduce James Stollenwerck ("Stollenwerck") to a registered trading firm so that Stollenwerck could open a trading account, but instead, used Stollenwerck's money to open an account in Rosenberg's own name and then pilfered the money for payment of his personal expenses. *See* Joint Final Pre-trial Order ("JFPO") at 3–7. The CFTC alleges that Rosenberg and his corporation, Pro Broker Service, Inc. ("Pro Broker"): (1) committed futures and options fraud, in violation of 7 U.S.C. §§ 6b(a)(i)-(iii), 6c(b) and 17 C.F.R. § 33.10 (1999); (2) unlawfully converted Stollenwerck's money in violation of 7 U.S.C. § 13(a)(1); (3) acted as a futures commission merchant ("FCM") or introducing broker ("IB") without registering as such and commingled funds in violation of 7 U.S.C. §§ 6d(1)-(2) and 17 C.F.R. § 33.3(b); and (4) failed to execute commodity option orders in violation of 17 C.F.R. § 33.9(c) and failed to issue written monthly account and confirmation statements, in violation of 17 C.F.R. § 1.33(a)-(b). *See id.* at 7–9.

Based upon my findings of fact and conclusions of law as set forth below,[1] I find that Rosenberg and Pro Broker have violated the Commodities Exchange Act and the regulations promulgated thereunder. Accordingly, I shall permanently enjoin Rosenberg and Pro Broker from further violations of the CEA as well as from trading commodity futures or options on futures on behalf of any other person or entity, including, but not limited to, any association, partnership, corporation, or trust. Furthermore, I shall order ancillary relief in the form of restitution.

## I. BACKGROUND AND PRELIMINARY EVIDENTIARY ISSUES

### A. The Nature of Commodity Futures and Options on Futures

This case is brought pursuant to the Commodities Exchange Act ("CEA"), 7 U.S.C. §§ 1 *et seq.*, a comprehensive statutory scheme governing the trading of commodity futures and options on futures.

---

1. Rule 52 of the Federal Rules of Civil Procedure provides, in pertinent part, that "[i]n all actions tried upon the facts without a jury or with an advisory jury, the court shall find the facts specially and state separately its conclusions of law thereon, and judgment shall be entered pursuant to Rule 58. . . ." Fed. R.Civ.P. 52(a).

*See id.* For the sake of clarity, this Court shall set forth a brief description of commodity trading.

Commodity futures trading involves contracts of sale for a specific quantity of a commodity[2] at a set price to be delivered at some future date. *See* 7 U.S.C. § 2(i) (1999); *see also Commodity Futures Trading Comm'n v. Co Petro Mktg. Group, Inc.,* 680 F.2d 573, 579–80 (9th Cir.1982); *Cargill, Inc. v. Hardin,* 452 F.2d 1154, 1156 (8th Cir.1971). Options trading involves contracts under which the holder has the right to purchase a commodity futures contract at a specified price. *See* Harold S. Bloomenthal, 3 Securities and Federal Corporate Law § 2.92 (1999).

In *Commodity Futures Trading Comm'n v. Standard Forex, Inc.,* No. CV–93–0088, 1996 WL 435440 (E.D.N.Y. July 25, 1996), the Court described futures contracts in the following way:

> A holder of futures contracts discharges his or her legal obligations under the contract by making or accepting delivery of the underlying commodity or by engaging in an opposite (offsetting) transaction-that is, purchasers and seller may extinguish their respective obligations to accept and deliver the subject commodity by forming offsetting contracts prior to the delivery date; the price differential between the opposite contracts determines the investor's profits or loss. Investors in futures contracts rarely actually transfer ownership and possession

of the underlying commodity. Usually, people invest in futures contracts for the purpose of assuming (speculating) or shifting (hedging) the risk of price change in commodities: neither do they expect actual delivery, nor does it occur.

*Id.* at *1 (internal citations omitted). The CEA was enacted to regulate the futures and options on futures market, and governs this enforcement action.

## B. Evidentiary Issues

Before the trial, Rosenberg filed a rash of motions *in limine,* seeking, among other things, to exclude from evidence tape recorded conversations between Rosenberg and Stollenwerck as well as the testimony of both Raymond Kent Driskill ("K.Driskill") and Carl Raymond Driskill ("C.Driskill"). *See* JFPO at 53–60; Notice of "Cross Motion *in limine* To Exclude Witness and Tape Recordings" at 1 (filed July 1, 1998); Notice of "Cross Motion *in limine* To Exclude Witnesses" at 1 (filed July 1, 1998).[3] On May 25, 1999, I filed an unpublished Opinion in which I excluded the tape recorded conversations ("Tapes") as inadmissible settlement discussions, pursuant to Federal Rule of Evidence 408, and also the testimony of the Driskills on the ground that the *in limine* motion was premature. *See CFTC v. Rosenberg, et al.,* No. 97–2927 at 16, 18 (D.N.J. filed May 25, 1999)("*Rosenberg I* ").

This Court then conducted a three-day bench trial in this matter, from May 25, 1999 until May 27, 1999. In the course of

---

**2.** The term "commodity" is defined as:

[W]heat, cotton, rice, corn, oats, barley, rye, flaxseed, grain sorghums, mill feeds, butter, eggs, Solanum tuberosum (Irish potatoes), wool, wool tops, fats and oils (including lard, tallow, cottonseed oil, peanut oil, soybean oil, and all other fats and oils), cottonseed meal, cottonseed, peanuts, soybeans, soybean meal, livestock, livestock products, and frozen concentrated orange juice, and all other goods and articles, except onions as provided in section 13–1 of this title, and all services, rights, and interests in which contracts for future delivery are presently or in the future dealt in.

7 U.S.C. § 1a(3) (1999).

**3.** On June 1, 1998 and July 1, 1998, the CFTC and Rosenberg, respectively, filed motions *in limine* in this case. *See CFTC v. Rosenberg,* No. 97–2927 at 2 (D.N.J. filed May 25, 1999)("*Rosenberg I* "). On January 28, 1999, I dismissed all of the motions *in limine* "without prejudice to the right of the parties to relist these motions on the first day of trial." *Id.* (citing Order, filed Jan. 28, 1999, at 2). After both parties again raised the arguments made in their respective motions *in limine* in the Joint Final Pretrial Order, filed November 18, 1998, I addressed the substance of the motions in an unpublished opinion, filed May 25, 1999. *See id.*

the trial, the CFTC moved for reargument of my decision to exclude the Tapes and Rosenberg renewed his objection to the admission of the Driskills' testimony. Considering Rosenberg's status as a *pro se* defendant and the nature of a non-jury trial, I provisionally admitted into evidence, subject to further review based upon the post-trial submissions of the parties: (1) the Tapes (Pl.'s Ex. 2) and the transcript of the Tapes (Pl.'s Ex. 3);[4] and (2) the trial testimony of C. Driskill and the *de bene esse* deposition of K. Driskill (Pl.'s Ex. 366).[5] Following the conclusion of the trial, on June 21, 1999, the parties submitted post-trial memoranda on the admissibility of both the Tapes and the Driskills' testimony. *See* Pl.'s Post–Trial Submission for Reconsideration of Exclusion of Audiotapes (filed June 21, 1999); Pl.'s Post–Trial Submission Regarding Testimony of the Driskills (filed June 21, 1999); Def.'s Letter Br. in lieu of More Formal Post Trial Submission ("Def.'s Br.")(filed June 21, 1999). I shall now address the admissibility of the Tapes and the corresponding transcript, the court testimony of C. Driskill and the *de bene esse* deposition testimony of K. Driskill (Pl.'s Ex. 366).

1. *The Tapes and Corresponding Transcript*

In its original opposition to Rosenberg's pre-trial motion *in limine* to exclude the Tapes, the CFTC argued, among other things, that the conversations Rosenberg had with Stollenwerck's lawyer, Gary Sin-

clair, Esq. ("Sinclair"), and the tape recorded conversations between Rosenberg and Stollenwerck did not implicate Federal Rule of Evidence 408[6] because of the absence of a disputed claim. *See* Pl.'s Opp. to Def.'s Mot. to Quash at 4. In the alternative, the CFTC contended that the *de bene esse* deposition of Sinclair and the Tapes were admissible because they would be offered for reasons other than to prove liability or damages, a well-established exception to Rule 408. *See id.* at 5. Specifically, the CFTC argued that:

> [It] is offering [this evidence] to show that Mr. Rosenberg's statements ... were part of an ongoing fraud, in that Mr. Rosenberg lied ... in an attempt to lull ... Mr. Stollenwerck into a false sense of security that Mr. Stollenwerck's money would be returned without resort to [the] legal process and without involving the authorities.

*See id.* at 6; *see also Rosenberg I*, at *14.

In my May 25, 1999 opinion, I assumed that the conversations between Rosenberg and Stollenwerck were settlement discussions and rejected the argument that the Tapes were admissible under the exception to Rule 408. *See Rosenberg I*, at *14–16. The following excerpt is illustrative:

> Rule 408 [ ] is inapplicable when the claim is based upon some wrong that was committed in the course of the settlement discussions; e.g., libel[,] assault, breach of contract. *Carney [v. American Univ.]*, 151 F.3d at 1095–96 (holding

4. It should be noted that a second transcript of conversations between Stollenwerck and Rosenberg, Pl.'s Ex. 412, was not admitted into evidence. *See* Trial Tr. at 193–98.

5. I also provisionally admitted Pl.'s Ex. 411, a summary of the Driskill transactions, the admissibility of which is dependent upon my ruling on the admissibility of the Driskills' testimony. *See* Trial Tr. 318–319.

6. Federal Rule of Evidence 408 provides:

> Evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was dis-

puted as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount. Evidence of conduct or statements made in compromise negotiations is likewise not admissible. This rule does not require the exclusion of any evidence otherwise discoverable merely because it is presented in the course of compromise negotiations. This rule also does not require exclusion when the evidence is offered for another purpose, such as proving bias or prejudice of a witness, negativing a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution.

that Rule 408 is inapplicable in such cases) (quoting 23 Charles Alan Wright & Kenneth W. Graham, Jr., *Federal Practice & Procedure* § 5314, at 282 (1980)). Evidence of settlement discussions is admissible to support a claim of retaliation where the underlying claim is race discrimination, *see Carney*, 151 F.3d at 1095, or to impose Rule 11 sanctions based on conduct during settlement discussions, *see Eisenberg v. University of New Mexico*, 936 F.2d 1131, 1134 (10th Cir.1991), or even to show that the defendant prevented the plaintiff from mitigating damages. *See Urico v. Parnell Oil Co.*, 708 F.2d 852, 854–55 (1st Cir.1983). Such evidence, however, is not admissible as proof of an ongoing scheme, because an "ongoing" scheme is not a "separate wrong." *See Carney*, 151 F.3d at 1096.

In the JFPO, the CFTC did not allege that Mr. Rosenberg performed "an illegal act ... during the course of settlement negotiations." *See United States v. J.R. LaPointe & Sons, Inc.*, 950 F.Supp. 21, 23 (D.Me.1996); JFPO at 3–7. Instead, the CFTC is attempting to use the Sinclair testimony and the tape recorded conversations to prove that Mr. Rosenberg committed civil fraud and not "to show that [Mr. Rosenberg] committed an entirely separate wrong." *Id.; see also Fiberglass [Insulators, Inc. v. Dupuy]*, 856 F.2d at 655 (excluding evidence of settlement discussions offered as proof of the continuation of a dispute).

Furthermore, the distinction that the CFTC is trying to draw between "liability" and "other purposes," however, is so fine that it is invisible. To the extent that the testimony of Gary Sinclair is proof of an "ongoing fraud," it must also be evidence that the fraud existed in the first place. In other words, these settlement discussions can only be proof of a "continuing fraud," if they are also evidence that Mr. Rosenberg was attempting to settle the original alleged fraud as well. Accordingly, I will grant Mr. Rosenberg's motion to exclude the *de bene esse* deposition testimony of Gary Sinclair, Esq., and the tape recorded conversations between Mr. Stollenwerck and Mr. Rosenberg.

*Rosenberg I*, at *14–16.

■ In its post-trial submission for "reconsideration" of the Tapes,[7] the CFTC advances four major contentions. First, the CFTC characterizes the conversations as efforts by Stollenwerck to close his account with Rosenberg's corporation, Pro Broker, and contends that as such, the discussions do not fall under the rubric of Rule 408. *See* Pl.'s Post–Trial Submission for Reconsideration of Exclusion of Audiotapes ("Pl.'s Tapes Br.") at 3. Second, and in the alternative, the CFTC re-asserts the applicability of the Rule 408 exception permitting admissibility for a purpose other than establishing liability or damages. *See id.* at 2. Next, the CFTC asserts that because Rosenberg was "not acting in good faith," the exclusion of the Tapes would be inconsistent with the underlying policy of Rule 408 to encourage good faith settlement discussions. *See id.* at 8. Finally, the CFTC urges this Court to use "surgical precision," ostensibly like the Third Circuit's decision in *Affiliated Mfrs. v. Aluminum Co. of Am.*, 56 F.3d 521, 526 (3d Cir.1995), and exclude only certain portions of the Tapes. *See id.* at *4. In opposition to the admission of the Tapes, Rosenberg relies on this Court's earlier application of Rule 408 and rejection of the Rule's exception in my unpublished opinion, *Rosenberg I. See* Def.'s Br. at 1.

■ A critical factor a court must consider in deciding whether or not a motion for reargument[8] should be granted is

---

7. The CFTC does not seek reargument of my *Rosenberg I* decision excluding from evidence the de bene esse deposition of Stollenwerck's attorney, Gary Sinclair, Esq. *See* Pl.'s PostTrial Submission for Reconsideration of Exclusion of Audiotapes, at 2 n. 1.

8. It is important to note that " 'reconsideration' and 'reargument' are interchangeable

whether the court "overlooked" factual matters or controlling decisions of law that might reasonably have resulted in a different conclusion had they been considered. *See* Local Civ. R. 7.1(g); *Damiano v. Sony Music Entertainment, Inc.,* 975 F.Supp. 623, 633–34 (D.N.J.1996)(Simandle, J.). To be sure, a motion for reargument "is an extremely limited procedural vehicle," *Resorts Int'l, Inc. v. Greate Bay Hotel & Casino, Inc.,* 830 F.Supp. 826, 831 (D.N.J.1992)(Gerry, C.J.), and relief under the rule is granted "very sparingly." *Maldonado v. Lucca,* 636 F.Supp. 621, 630 (D.N.J.1986)(Barry, J.). For the reasons set forth below, I find that in arriving at my decision in *Rosenberg I,* I overlooked no factual matter or decision of law that might reasonably have resulted in a different conclusion had it been considered. Accordingly, I shall exclude the Tapes (Pl.'s Ex. 2) and the corresponding transcript (Pl.'s Ex. 3) in their entireties.

In its memorandum in support of the admission of the Tapes, the CFTC seems to concede the existence of a "disputed claim"[9] and instead, argues that the conversations, allegedly mere efforts to close the account and obtain the money, do not involve attempts to settle or compromise a claim under Rule 408. *See* Pl.'s Tapes Br. at 3. In support of its interpretation of the Tapes, the CFTC cites *Winchester Packaging, Inc. v. Mobil Chemical Co.,* 14 F.3d 316 (7th Cir.1994), and *Kraemer v. Franklin and Marshall College,* 909 F.Supp. 267 (E.D.Pa.1995) for the proposition that a mere demand for payment, even in conjunction with the threat of legal action, is not an offer of settlement. *See Winchester,* 14 F.3d at 319; *Kraemer,* 909 F.Supp. at 268.

While it is true that the Tapes reflect both Stollenwerck's attempt to close the account and his demand for the return of some amount of money, the CFTC's interpretation is remarkably incomplete. For instance, in the first conversation, Stollenwerck threatens Rosenberg with legal action[10] and clearly demands what he believes to be the remaining account balance, $116,498, so that negotiations could move forward.[11] I find that this precursor to

terms," *Public Interest Research Group of New Jersey v. Yates Indus., Inc.,* 790 F.Supp. 511, 512 n. 1 (D.N.J.1991)(Thompson, J.), and therefore I shall treat the CFTC's motion for "reconsideration" as a motion for reargument under the New Jersey Local Civil Rules. *See* Local Civ. R. 7.1(g).

9. Despite the CFTC's concession, this Court finds inherent in each of the three conversations between Stollenwerck and Rosenberg the dispute concerning damages, or the amount actually owed, bringing the Tapes unquestionably within the scope of Rule 408. *See* Fed.R.Evid. 408 (providing that "evidence . . . attempting to compromise a claim which was disputed as to either validity or amount [] is not admissible to prove liability for or invalidity of the claim or its amount"). It follows that the conversations, which included differing versions of the amount of money remaining in the account, were attempts to compromise the dispute. Although Rosenberg failed to provide evidence supporting his claim of the existence of a dispute, Stollenwerck did testify that after Rosenberg initially told him the account was "flat:"

> [Rosenberg's] story started changing immediately, one day he would tell me one thing and the next day he would tell me another. I think at one point he mentioned there was 70 thousand dollars in the account, at one point he mentioned to me that there was only 5 thousand dollars of gains in the account that year. It became nebulous. . . .

Trial Tr. at 72 (May 25,1999).

10. In the course of the first conversation, Stollenwerck tells Rosenberg that "the laws that have been broken here are multiple," *see* Pl.'s Ex. 2 at 34, followed by this exchange:
> *Mr. Stollenwerck:* Okay. I gave you seven days to unwind [the account] and get [the money] back to me. But basically, you know, you're backing me into a corner with this.
> *Mr. Rosenberg:* Yeah. I don't want to do that to you.
> *Mr. Stollenwerck:* No, you don't want to do it to me. It could be horrifying, what the results are.

*Id.* at 36.

11. The transcript provides, in relevant part:
> *Mr. Rosenberg:* Well, can I meet you next Tuesday, then, the following Tuesday?
> *Mr. Stollenwerck:* Murray, I would like— you know something? What I want you to

settlement is a term or condition of the settlement negotiations, thereby bringing the conversation within the sweep of Rule 408. To find such a conversation admissible would run afoul of the policy considerations behind Rule 408 protecting frank disclosure for the purpose of compromise and settlement of disputes. *See* Advisory Committee's Note, Fed.R.Evid. 408; *United States v. Clatworthy*, No. 91–CIV–6211, 1992 WL 6179 at *3 n. 6 (S.D.N.Y. Jan.8, 1992); *see generally Affiliated Mfrs., Inc. v. Aluminum Co. of Am.*, 56 F.3d 521, 526 (3d Cir.1995)("[t]he policy behind Rule 408 is to encourage freedom of discussion with regard to compromise"); *Fiberglass Insulators, Inc. v. Dupuy*, 856 F.2d 652, 654 (4th Cir.1988)("[t]he public policy of favoring and encouraging settlement makes necessary the inadmissibility of settlement negotiations in order to foster frank discussions"); *United States v. Contra Costa County Water Dist.*, 678 F.2d 90, 92 (9th Cir.1982)("[b]y preventing settlement negotiations from being admitted as evidence, full and open disclosure is encouraged, thereby furthering the policy toward settlement"); *Lo Bosco v. Kure Eng'g Ltd.*, 891 F.Supp. 1035, 1037–38 (D.N.J.1995)(Wolin, J.)(stating that one of the primary rationales supporting Rule 408 is the "obvious public policy interest in encouraging settlement of private disputes"). While it is unclear whether the CFTC's argument is intended to reach the second and third conversations on the Tapes, which contain Rosenberg's offer to pay Stollenwerck $100,000 per year for three years in settlement of the claim and the break down of that offer and the negotiations as a whole, the application of Rule 408 is clear. I therefore find no merit in the CFTC's argument that the substance of the Tapes removes them from the scope of Rule 408.

do is wire me the money now, and then I'll meet with you. That'll be a sign of good faith.... If you would wire me the 160— the 116,000 bucks, to begin with, then we've got something to work with....

I need not dwell on the CFTC's policy justifications or argument that the Tapes are admissible pursuant to the exception of Rule 408 since these contentions were previously addressed in *Rosenberg I* and the CFTC has failed to raise any factual matters or present controlling decisions of law that this Court overlooked. *See* Local Civ. R. 7.1(g); *Damiano v. Sony Music Entertainment, Inc.*, 975 F.Supp. 623, 633–34 (D.N.J.1996)(Simandle, J.).

■ Finally, I find it impossible to parse the taped conversations for content that is, as the CFTC contends, "not made in the context of settlement negotiations." Pl.'s Tapes Br. at 4. The CFTC urges this Court to use "surgical precision" and exclude only "that portion of the audiotapes which concerns Mr. Rosenberg's offers to repay Mr. Stollenwerck over time." *Id.* (citing *Affiliated Mfrs., Inc. v. Aluminum Co. of Am.*, 56 F.3d 521, 523 (3d Cir.1995)). Taken to its inevitable conclusion, this argument would result in the admission into evidence of numerous damaging statements and admissions by Rosenberg concerning his involvement in Stollenwerck's trading account.

Not only am I unable to find support in *Affiliated Mfrs.* for such a narrow interpretation of the Rule, but the Rule's text expressly precludes such an application. Rule 408 specifically provides that "[e]vidence of conduct or statements made in compromise negotiations is ... not admissible." *See* Fed.R.Evid. 408; *see also Kritikos v. Palmer Johnson, Inc.*, 821 F.2d 418, 421–23 (7th Cir.1987)(letters advising plaintiff of possible compromise plan prior to institution of legal action were inadmissible under Rule 408 rationale). Accordingly, the Tapes and the accompanying transcript are inadmissible in their entireties.

Okay. If you've—really—if you want to go forward with me, you've got to wire me that money.
Pl.'s Ex. 2 at 37–38, 40.

This Court's inquiry, however, is not at an end. During the trial, the CFTC also moved to introduce the Tapes and transcript on rebuttal for purposes of impeaching the testimony of Rosenberg. *See* Trial Tr. at 427–28. Rosenberg renewed his objection to their admissibility, presumably on the ground raised in his pretrial motion *in limine* that Stollenwerck had taped the conversations for "blackmail" purposes. Again, I provisionally permitted the use of the Tapes and transcript to cross-examine Rosenberg, subject to my findings based upon the post-trial submissions of the parties. *See id.* at 428. For the reasons set forth below, I find that the Tapes and transcript are admissible for purposes of impeachment.

Numerous courts have held that the exception to Rule 408, allowing the admission of settlement negotiation evidence when offered for a purpose other than to establish liability or damages, permits the use of such evidence for purposes of rebuttal or impeachment. *See Freidus v. First Nat'l Bank*, 928 F.2d 793 (8th Cir.1991); *County of Hennepin v. AFG Indus., Inc.*, 726 F.2d 149, 153 (8th Cir.1984); *John McShain, Inc. v. Cessna Aircraft Co.*, 563 F.2d 632, 635 (3d Cir.1977); *Wisconsin Pub. Serv. Corp. v. Ecodyne Corp.*, 702 F.Supp. 217, 218 (E.D.Wis.1988); *cf. Reichenbach v. Smith*, 528 F.2d 1072, 1075 (5th Cir.1976)(because of broad discretion to conduct trial, court found no harmful error when trial judge prohibited cross-examination on settlement but stated the decision was not "an approval for the future of the trial court's approach ... [t]he existence of a settlement agreement goes directly to the issue of credibility and usually the better approach is that codified in Rule

408"). In this case, the Tapes and transcript were properly used to rebut Rosenberg's testimony and to impeach his credibility during cross-examination. *See* Trial Tr. at 429, 451–52; 453–54. Yet, Rosenberg asserts that the Tapes were unlawfully made and therefore inadmissible for purposes of impeachment.

As I noted in *Rosenberg I*, the Tapes are inadmissible if made "for the purpose of committing any criminal or tortious act in violation of the Constitution or laws or the United States or of any State." *See Rosenberg I*, at \*16 (quoting 18 U.S.C. § 2511(2)(d)).[12] Rosenberg has alleged that the conversations were taped "for blackmail" purposes, *see* Certif. of Murray I. Rosenberg at ¶ 11 (filed July 1, 1998), while the CFTC claims that "Mr. Stollenwerck ... audiotaped his telephone conversations with Mr. Rosenberg in an attempt to protect himself and prevent further distortions of Mr. Rosenberg's story." Pl.'s Opp. at 11. Rosenberg, as the party attempting to suppress a recording, has the burden of proving that the Tapes were made for an impermissible purpose. *See United States v. Cassiere*, 4 F.3d 1006, 1021 (1st Cir.1993)(preponderance of the evidence standard); *Traficant v. Commissioner of I.R.S.*, 884 F.2d 258, 266 (6th Cir.1989); *United States v. Phillips*, 540 F.2d 319, 326 (8th Cir.1976); *United States v. Nietupski*, 731 F.Supp. 881, 882–83 (C.D.Ill.1990)(citing *Traficant*, 884 F.2d at 266).

Rosenberg has not submitted a shred of comprehensible evidence that Stollenwerck made the Tapes for a criminal or tortious purpose. While this Court is sympathetic to the obstacles faced by *pro se* litigants and the often confused submissions which result, I am unable to find any coherent support for Rosenberg's argument that he

---

**12.** Section 2511 of the Omnibus Crime Control and Safe Streets Act of 1968 provides, in relevant part:

It shall not be unlawful under this chapter for a person not acting under color of law to intercept a wire, oral, or electronic communication where such person is a party to the communication or where one of the parties to the communication has given prior consent to such interception unless such communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State.

18 U.S.C.A. § 2511(2)(d) (West Supp.1999).

was "blackmailed."[13] There is no evidence that Stollenwerck used the Tapes for an unlawful purpose or even threatened to use them to blackmail Rosenberg.

That being said, even if this Court were to read into Rosenberg's statements that he sufficiently raised the issue of blackmail, a finding in Rosenberg's favor is wholly precluded by Rosenberg's incredibility as a witness. At trial, Rosenberg was evasive, uncooperative, and bordered on incorrigible. Conversely, Stollenwerck was highly credible, lending support to this Court's determination that Stollenwerck made the Tapes to prevent future distortions by Rosenberg.[14] Accordingly, I find that Rosenberg has failed to meet his burden of proving by a preponderance of the evidence that the Tapes were made for an illegal or improper purpose. In sum, I find the Tapes and transcript are admissible for impeachment purposes only.

### 2. The Testimony of Carl Raymond and Raymond Kent Driskill

 Also during the course of trial, Rosenberg renewed his objection to the admission of the *de bene esse* deposition of Raymond Kent Driskill ("K.Driskill") and the trial testimony of Carl Raymond Driskill ("C.Driskill"). *See* Trial Tr. at 269–274. Again, because of Rosenberg's *pro se* status and the fact that the case was not tried before a jury, I provisionally admitted the testimony and deposition to allow Rosenberg a second bite at the proverbial apple. *See* Trial Tr. at 272. In his post-trial submission, Rosenberg contends that the trial testimony and *de bene esse* deposition of the Driskills' are inadmissible under Federal Rule of Evidence 404(b), presumably because they are offered to prove propensity, and under Federal Rule of Evidence 401, because they are irrelevant. *See* Def.'s Br. at 2–3. In support of the admission of the evidence, the CFTC argues that the testimony and deposition of the Driskills are offered to prove Rosenberg's intent and method of operation, and to show that there is a "substantial likelihood that Mr. Rosenberg will commit similar offenses unless restrained and enjoined."[15] Pl.'s Post–Trial

---

13. Rosenberg submitted the following in support of excluding the Tapes and accompanying transcript:

> I faxed [Stollenwerck's attorney] Mr. Sinclair a subdivision plan for property that my sister agreed to allow me to use for collateral to show good faith. The perceived blackmail from Mr. Sinclair and Mr. Stollenwerck was real. And [sic] the obligation that I had with Mr. Stone in managing five accounts worth over $1 million, and the joint venture of International Options with Mr. Stone and Mr. Stollenwerck gave me no choice but to negotiate in whatever style Mr. Sinclair and Mr. Stollenwerck conceived. My perception was of them being the prosecutors.
> Mr. Sinclair claimed he would develop some documents to our negotiations. And this never appeared after I showed good faith with the subdivision plans. The tape recorded conversations between Mr. Stollenwerck and myself are negotiations, and this is the only form they chose to follow. They continuously deceived me by taping and reproducing what was favorable to them. They, being the blackmailers, and myself, the victim.

Def.'s Br. at 1 (filed June 21, 1999).

14. At trial, Stollenwerck testified:

> Q (by CFTC attorney Ms. Kenmotsu): Mr. Stollenwerck, why did you tape that conversation?
> A (by Mr. Stollenwerck): I started taping every conversation I had with Murray from the time I found out that there was no money in the account basically just to start documenting everything I did with him or talked with him about.
> Q: Was Mr. Rosenberg telling you consistent stories at that time regarding what had happened to the money?
> A: I can't recall whether he was telling me consistent stories about—everything changed, I mean even within the conversation things would change. He'd say, yes, I'm going to wire you the money then, no, I'm not. I was just keeping a record of it. Basically I had no plan for the tapes. I didn't even know whether the tapes were legal or anything. I just was taping these conversations so that in case down the line I could—somebody would believe my story.

Trial Tr. at 113–14.

15. This Court finds Federal Rule of Evidence 404(b) inapplicable to the question of whether injunctive relief is warranted in this case. *See*

Submission Regarding Testimony of the Driskills ("Pl.'s Driskill Br.") at 3. The evidence at issue includes testimony concerning the Driskills' involvement with Rosenberg from 1992–94 in a trading relationship similar to the one between Stollenwerck and Rosenberg. Specifically, the Driskills testified that Rosenberg depleted a trading account, funded by C. Driskill, by making unauthorized withdrawals for his personal expenses. *See* Section II, Findings of Fact, *infra.* For the reasons set forth below, I find both the trial testimony of C. Driskill and K. Driskill's *de bene esse* deposition admissible.

■ In *United States v. DeLaurentis,* 83 F.Supp.2d 455 (D.N.J. 2000), this Court had the opportunity to explore Federal Rule of Evidence 404(b) which provides in relevant part that:

> Evidence of other crimes, wrong, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident....

Fed.R.Evid. 404(b). Applicable in both the civil and criminal contexts, Rule 404(b) is a rule of inclusion, "designed to promote the admission of evidence," but acts to prohibit "evidence offered solely to prove a defendant's character or to demonstrate that a defendant has a propensity to commit a crime." *DeLaurentis,* 83 F.Supp.2d at 466 (citing *United States v. Sriyuth,* 98 F.3d 739, 745 (3d Cir.1996); *United States v. Sampson,* 980 F.2d 883, 886–87 (3d Cir. 1992); *United States v. Scarfo,* 850 F.2d 1015, 1019 (3d Cir.1988)). In other words, evidence of prior bad acts "must be probative of a material issue other than character to be admissible." *Id.* (citing *United States v. Butch,* 48 F.Supp.2d 453, 457

*e.g., CFTC v. Hunt,* 591 F.2d 1211, 1220 (7th Cir.1979)(instructing courts to consider past misconduct when determining whether to issue an injunction to prevent further violations of the CEA). Accordingly, this Court will entertain the CFTC's "injunction" argument

(D.N.J.1999)(Orlofsky, J.) (citation omitted)).

To protect against the admission of evidence offered to prove the defendant's propensity to commit the act in question, the CFTC must " 'clearly articulate how [the prior bad act] evidence fits into a chain of logical inferences, no link of which can be the inference that because the defendant committed ... offenses before, he therefore is more likely to have committed this one.' " *Id.* (quoting *United States v. Morley,* 199 F.3d 129, 137 (3d Cir.1999) (citation omitted)). "Once the Government has met this burden, 'the [D]istrict [C]ourt must put a chain of inferences into the record, none of which is the inference that the defendant has a propensity to commit [the act in question]." *Id.* (quoting *Morley,* 199 F.3d at 137) (citation omitted).

In *United States v. Mastrangelo,* 172 F.3d 288 (3d Cir.1999), the Third Circuit repeated the well-established four-pronged test governing the admissibility of evidence under Rule 404(b):

> Admissibility under [Federal Rule of Evidence] 404(b) requires: (1) a proper evidentiary purpose; (2) relevance under [Federal Rule of Evidence] 402; (3) a weighing of the probative value of the evidence against its prejudicial effect under [Federal Rule of Evidence] 403; and (4) a limiting instruction concerning the purpose for which the evidence may be used.

*Id.* at 294–95 (citing *Huddleston v. United States,* 485 U.S. 681, 691–92, 108 S.Ct. 1496, 99 L.E.2d 771 (1988)).

■ Regarding the first prong of the test, I conclude that "intent" is a proper evidentiary purpose for the admission of the Driskill evidence.[16] Not only is intent

concerning the testimony of the Driskills in Section III, *infra.*

16. I find that the weight of judicial authority precludes the CFTC's argument that the Driskill evidence is admissible as Rosenberg's

an exception enumerated in Rule 404(b), but it is well-established that similar prior acts may be admitted to show a pattern of operation suggestive of intent where it is in fact an issue at trial. *See Jannotta v. Subway Sandwich Shops, Inc.,* 125 F.3d 503, 517 (7th Cir.1997)(stating that trial court properly admitted testimony of other defrauded individuals as proof of intent in common law fraud action); *Morganroth & Morganroth v. DeLorean,* 123 F.3d 374, 379 (6th Cir.1997)(finding that district court properly admitted evidence that defendant consistently failed to pay other lawyers to prove intent on fraud claim); *Wegerer v. First Commodity Corp. of Boston,* 744 F.2d 719, 724 (10th Cir.1984)(stating that trial court properly admitted prior consent decree in commodities fraud action for purpose of showing intent and knowledge). Since intent is at issue in determining whether Rosenberg acted with the requisite scienter in his alleged violation of the CEA anti-fraud provisions,[17] I find that the CFTC has articulated a proper purpose for the admission of the Driskills' testimony.

I also find that the proffered testimony is relevant to the purpose for which it is offered. " 'Relevant evidence' means evidence having any tendency to make the existence of a fact that is of consequence to a determination of the action more probable or less probable than it would be without the evidence." Fed.R.Evid. 401. In this case, credible evidence of an analogous trading scheme that occurred close in time to the alleged violation, *see* Pl.'s Ex. 411,

makes it more probable that Rosenberg intended to defraud Stollenwerck.

▮▮▮ Moreover, I find that the Driskill evidence is more probative than prejudicial. According to Federal Rule of Evidence 403, "[e]vidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." *Id.; see also DeLaurentis,* 83 F.Supp.2d at 468. In weighing the evidence, the District Court must assess " 'the genuine need for the challenged evidence and balance that necessity against the risk that the information will influence the jury to convict on improper grounds." *DeLaurentis,* at 468 (quoting *Sriyuth,* 98 F.3d at 747–48 (citation omitted)). Moreover, "the need for the evidence is to be considered 'in view of the contested issues and other evidence available to the [plaintiff], and the strength of the evidence in proving the issue.' " *Id.* (quoting *Sriyuth,* 98 F.3d at 748 (citation omitted)).

Simply stated, the Driskill evidence is essential to establish that Rosenberg intended to defraud Stollenwerck in violation of the CEA. Moreover, considering the substantial similarity of the Driskill and Stollenwerck transactions, the Driskill evidence is highly probative. Since the danger of unfair prejudice is largely, if not completely, non-existent in a non-jury bench trial, I find that the significant pro-

---

*"modus operandi."* See Pl.'s Driskill Br. at 2, 3. *Modus operandi,* usually a method of proving identity, *see J & R Ice Cream Corp. v. California Smoothie Licensing Corp.,* 31 F.3d 1259, 1269 n. 9 (3d Cir.1994), is a type of signature quality or striking similarity between two events. *See generally, United States v. Crowder,* 87 F.3d 1405, 1413 (D.C.Cir. 1996). In this case, this Court finds that Rosenberg's alleged pattern of conduct with the Driskills, where he formed a corporation, is sufficiently distinct from his alleged dealings with Stollenwerck to qualify for admission under the *"modus operandi"* exception.

17. To establish a claim for futures and options fraud under Sections 4b(a) and 4c(b) of the CEA, 7 U.S.C. §§ 6b(a), 6c(b)(1999), in an enforcement action, the CFTC must demonstrate that the defendant made a material representation of presently existing or past fact with scienter. *See* Conclusions of Law (citing *CFTC v. Avco Fin. Corp.,* 28 F.Supp.2d 104, 115 (S.D.N.Y.1998)). The term "scienter" refers to a mental state embracing an intent to deceive, manipulate, or defraud. *See* Conclusions of Law (citing *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976)).

bative value of the evidence weighs in favor of admission. Accordingly, because the testimony of C. Driskill and the *de bene esse* deposition of K. Driskill are offered for a proper evidentiary purpose, are relevant, and are more probative than prejudicial, I shall admit the testimony into evidence.[18] Finally, pursuant to the fourth prong of the *Mastrangelo* test, I find that a limiting instruction is not necessary considering the non-jury nature of the trial.

In sum, when making my findings of fact and conclusions of law, I shall consider the Driskill evidence only with respect to whether Rosenberg possessed the requisite fraudulent intent to violate the CEA. I shall now make my findings of fact and conclusions of law in accordance with Federal Rule of Civil Procedure 52(a).

## II. FINDINGS OF FACT

### A. The Parties and Jurisdiction

1. Plaintiff Commodity Futures Trading Commission ("CFTC") is an independent agency of the United States Government responsible for administering and enforcing the provisions of the Commodity Exchange Act, 7 U.S.C. §§ 1 *et seq.* (1999)("CEA"), and promulgating and enforcing the CEA's supporting regulations, 17 C.F.R. §§ 1 *et seq.* (1999).

2. Defendant Murray I. Rosenberg ("Rosenberg"), d/b/a Pro Broker Service, Inc., a/k/a Pro–Broker Services, Inc., is an individual who resides at RR1 Box 165U, Mullica Hill, New Jersey 08062. *See* Pl.'s Ex. 373, Tabs N and O (Pl.'s First Request for Admissions and Answers) at ¶ B1. The only capacity in which Rosenberg has been registered with the CFTC is as a floor broker, from April 9, 1985 until January 21, 1995. *See* Trial Tr. at 279; Pl.'s Ex. 373, Tabs N and O at ¶¶ B151–52.

3. Defendant Pro Broker Service, Inc., a/k/a Pro–Broker Services, Inc., ("Pro Broker") is a New Jersey corporation incorporated by Rosenberg on or about November 4, 1993. *See* Pl.'s Ex. 373, Tabs N and O, ¶ B139; Trial Tr. at 407. At all times relevant to this litigation, Rosenberg had exclusive control of Pro Broker and held himself out as having such control: he was its only employee and director, he had the authority to sign contracts on Pro Broker's behalf, he opened a bank account for Pro Broker, of which he was the sole signatory, and only Rosenberg could withdraw funds from Pro Broker's bank account. *See* Trial Tr. at 407–08; *see also* Pl.'s Ex. 366 (K. Driskill Dep.) at 24–26. Pro Broker has never been registered with the CFTC in any capacity. *See* Trial Tr. at 279; Pl.'s Ex. 363, Tabs N and O at ¶ B13.

4. This Court has jurisdiction pursuant to 7 U.S.C. § 13a–1[19] and 28 U.S.C. §§ 1331,[20] 1348.[21]

18. As set forth above, I provisionally admitted Pl.'s Ex. 411, the summary of the Driskill testimony, pending my post-trial decision of the admissibility of the trial testimony of C. Driskill and the *de bene esse* deposition of K. Driskill (Pl.'s Ex. 366). Considering that the Driskill testimony is admissible, I shall also admit into evidence the summary of the Driskill transactions, Pl.'s Ex. 411.

19. 7 U.S.C. § 13a–1 (1999) provides, in relevant part:

Whenever it shall appear to the Commission that any contract market or other person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of this chapter or any rule, regulation, or order thereunder, or is restraining trading in any commodity for future delivery, the Commission may

bring an action in the proper district court of the United States ... to enjoin such act or practice, or to enforce compliance with this chapter, or any rule, regulation or order thereunder, and said courts shall have jurisdiction to entertain such actions....
*Id.* at § 13a–1(a).

20. Section 1331 provides that "[t]he district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331.

21. 28 U.S.C. § 1345 provides that "[e]xcept as otherwise provided by Act of Congress, the district courts shall have original jurisdiction of all civil actions, suits or proceedings commenced by the United States, or by any agen-

## B. Rosenberg's Relationship with Stollenwerck

5. James W. Stollenwerck ("Stollenwerck") is an individual residing in Westerly, Rhode Island, who has traded commodity futures and options on futures on behalf of himself and his wife since 1992. *See* Trial Tr. at 13. In April, 1992, Stollenwerck traded commodity futures and options on commodity futures through his broker, Robin Rosenberg,[22] at First American Discount Corporation ("First American"), a registered futures commission merchant ("FCM"). *See id.* at 16. Stollenwerck paid commissions to First American in the amount of sixty dollars per round turn. *See id.* at 17.

6. In or about the fall of 1992, as Stollenwerck was becoming more interested in options trading, Stollenwerck's broker, Robin Rosenberg, referred him to Murray Rosenberg for assistance in options trading and strategy. *See* Trial Tr. at 19. Although the initial meeting between Stollenwerck and Rosenberg occurred during a three-way telephone conversation involving Robin Rosenberg, soon Stollenwerck was regularly speaking with Rosenberg individually and receiving free strategical options advice and information. *See id.* at 19–22. For the next six months, Rosenberg dispensed to Stollenwerck free options advice "as infrequently as twice a week or . . . as frequently as twice a day," with each conversation lasting between five and twenty minutes. *See id.* Although Stollenwerck maintained his trading account at First American throughout this time, he contemplated leaving First American because of his displeasure with the commission structure. *See* Trial Tr. at 23–24. When he conveyed his discontent, First American offered him a lower commission rate. *See id.* at 24.

7. In early 1993, Rosenberg contacted Stollenwerck and offered to execute Stollenwerck's commodity futures and options on futures trades for a commission rate of ten dollars per round turn, a fraction of Stollenwerck's cost at First American. *See* Trial Tr. at 25, 419. Specifically, Rosenberg told Stollenwerck that Rosenberg's corporation, Pro Broker, would execute the trades through Gerald, Inc., a registered FCM. For its services, Pro Broker would retain two of the ten dollar commission rate, while Gerald, Inc. would see the remaining eight dollars as profit. *See id.* at 26. Moreover, Rosenberg told Stollenwerck that he would open Stollenwerck's personal account at Gerald, Inc. in Stollenwerck's name. *See id.* at 27–28. The two men agreed that Stollenwerck was the only person allowed to withdraw funds from the account. *See id.* at 28.

8. Subsequently, Stollenwerck completed a Pro Broker account application form and submitted the form to Rosenberg. *See* Trial Tr. at 28. The application did not authorize Rosenberg to withdraw funds from Stollenwerck's future account at Gerald, Inc. nor did it indicate that the account would be opened in a name other than Stollenwerck's. *See id.*

9. Contrary to his agreement with Stollenwerck, on May 10, 1993, Rosenberg opened Gerald Inc. Account Number 827–82715 ("Gerald Account") in his own name. *See* Pl.'s Ex. 11, Trial Tr. at 291 (relying on Pl.'s Exs. 135, 136, 313). Rosenberg had sole authority both to withdraw funds from and to execute trades through the Gerald Account. *See* Pl.'s Ex. 373, Tabs N and O at ¶¶ B26–27; Trial Tr. at 440.

10. Rosenberg then gave Stollenwerck instructions to wire funds to Gerald, Inc.'s bank account at Chase Manhattan Bank, Account Number 9101457464, for the benefit of Pro Broker. *See* Trial Tr. at 39, 44–45. On August 2, 1993, February 4, 1994, and March 15, 1995, Stollenwerck wired a total of $265,000 to the Chase Manhattan

cy or officer thereof expressly authorized to sue by Act of Congress."

22. There is no relation between Robin Rosenberg, the First American broker, and the Defendant, Murray I. Rosenberg. *See* Trial Tr. at 16, 408.

Bank to fund what he believed was his trading account at Gerald, Inc. *See* Trial Tr. 39, 43, 45, 49; Pl.'s Exs. 135, 313.[23] Instead, the wired monies were deposited into Rosenberg's Gerald Account. *See* Pl.'s Ex. 11; *see also* Trial Tr. at 46–48.

11. After Stollenwerck wired the money to the Gerald Account, he began to call in commodity futures and options on futures trades telephonically to Rosenberg. *See* Trial Tr. at 55. Following each trade request, Rosenberg would return Stollenwerck's call, repeat Stollenwerck's order, and report the order's fill information. *See id.* However, Stollenwerck's trades were never confirmed in writing and both Rosenberg and Pro Broker failed to provide monthly account statements, because, as Rosenberg told Stollenwerck, the operation was small and he did not have "back office capability." *Id.* at 29–30, 348–49. Consequently, Stollenwerck kept a written, and later computerized, ledger or tally of his trades with Rosenberg. *See id.* at 55, 68–70; Pl.'s Ex. 5. Stollenwerck also regularly verbally verified the amount of his account with Rosenberg. *See* Trial Tr. at 55–56. In fact, based in part upon Rosenberg's assertions, on March 15, 1995, Stollenwerck made the largest deposit, $165,000, because he believed the Gerald Account was "doing great." *See* Trial Tr. at 130–31.

12. In early 1994 and early 1995, Stollenwerck received from Rosenberg and Pro Broker 1099 tax statements of profits and losses for the account Stollenwerck believed he had at Gerald, Inc. *See* Trial Tr. at 51; Pl.'s Ex. 137. The information provided in the 1099 statements conformed to Stollenwerck's understanding of the account. For example, the 1099 tax form was prepared by Pro Broker for Gerald Account number 827–82715, it was addressed to Stollenwerck and contained his Social Security number as the tax identifi-

cation number. *See* Pl.'s Exs. 137, 138; Trial Tr. at 53. In addition, the 1099 tax form for the year 1993 reflected a loss of $12,177.60, which Stollenwerck believed, based upon the trade notes in his personal ledger and Rosenberg's representations, was an accurate reflection of the account's balance. *See* Pl.'s Exs. 137; Trial Tr. at 33, 53. Similarly, the 1099 tax form for 1994 reflected a loss of $2,540.00, again an amount which comported with Stollenwerck's understanding of his account balance. *See* Pl.'s Ex. 138; Trial Tr. 33. Pursuant to law, Stollenwerck filed the 1099s provided by Rosenberg and Pro Broker with the Internal Revenue Service. *See* Trial Tr. at 51.

13. Based upon his personal computerized record keeping, Stollenwerck believed that, during the 1995 tax year, he had gains of $389,041.05. *See* Pl.'s Ex. 5; Trial Tr. 68–72, 447–450. Yet, in early 1996, Rosenberg told Stollenwerck that the trading account had not made a profit and that "there was no money in it." Trial Tr. at 57, 67–68.

## C. The History of Stollenwerck's Trading Account

14. Unbeknownst to Stollenwerck, Rosenberg had failed to execute many of Stollenwerck's trade orders. *See* Trial Tr. at 59, 297; Pl.'s Exs. 6, 11. Specifically, the Gerald, Inc. records show that from June 1994 through February 1995, not one trade originated from the Gerald Account, *see* Pl.'s Exs. 6, 11; Trial Tr. 58–59, yet, from early 1993 until sometime in 1996, Rosenberg had confirmed Stollenwerck's steady stream of trade orders, *see* Trial Tr. 55, 57–59; Pl.'s Ex. 5. Moreover, the Gerald Account balance remained at a stagnant ninety-nine dollars throughout this entire period, yet Rosenberg reported to Stollenwerck that it was much higher.

---

**23.** Stollenwerck alleges that he made a total of four deposits, beginning with a $50,000 transfer in March, 1993. *See* Trial Tr. at 34. Neither Stollenwerck nor the CFTC was able to provide any documented proof of the trans-

fer, *see id.* at 125–26, and therefore I find that the CFTC has failed to meet its burden of proof with respect to Stollenwerck's March, 1993 transfer.

441

*See generally,* Trial Tr. at 55–56 (Stollenwerck testifying that Rosenberg's balance reports were not perfect, but were "within a thousand dollars" of Stollenwerck's ledger balance "which [was] accurate enough").

15. Not only did Rosenberg disregard Stollenwerck's trade requests and respond with fictitious "fill" reports, but Rosenberg also made trades in the account without Stollenwerck's permission. *See.* Trial Tr. 63, 410–17; *see also* Pl.'s Ex. 373, Tabs N and O, ¶ B119. These unauthorized trades, while clearly discernible in the monthly commodity statements sent to Rosenberg by Gerald, Inc., were not included in the 1099s prepared by Rosenberg and sent to Stollenwerck. *See* Pl.'s Exs. 11, 137, 138. Thus, the Gerald Account experienced approximately $27,000 and $24,500 more losses in 1993 and 1994, respectively, than was reported to Stollenwerck. *See* Trial Tr. at 298; Pl.'s Exs. 60 (reporting total 1994 loss as $27,561.47), 61 (reporting total 1993 loss as $39,426.37), 137, 138.

16. As set forth above, Stollenwerck deposited a total of $265,000 into the Gerald Account. *See* Findings of Fact, ¶ 10. While Rosenberg himself deposited about $26,000 into the account, *see* Pl.'s Ex. 373, Tabs N and O, ¶¶ B29, B32; Pl.'s Ex. 11, he withdrew or caused to be withdrawn $229,429 from the Gerald Account. *See* Trial Tr. at 294; Pl.'s Exs. 6, 11, 13–59, 139–58, 160–61, 376–88, 399–406.[24] Of the total $229,429 withdrawn from the account, approximately $140,149 was made payable to Rosenberg while $86,650 was withdrawn and made payable to Pro Broker or for Pro Broker in care of Rosenberg.[25] *See* Trial Tr. at 294; Pl.'s Ex. 6, 13–16, 19–32, 48–59, 139–57, 160–61, 376–88, 399–406. Rosenberg did not notify Stollenwerck of the withdrawals from the Gerald Account, *see* Trial Tr. at 420, which he testified he made for his personal use, including living expenses, or more generally, for "[s]ex, drugs, and rock and roll. I mean for what? For me, everything, Murray I. Rosenberg." Trial Tr. at 441; *see also id.* at 335–36, 436–41, 444. Rosenberg also withdrew money on Pro Broker's behalf for payment of his personal expenses. *See* Trial Tr. at 444. The only person to withdraw money from the Gerald Account, Rosenberg used it like his personal bank account. *See* Trial Tr. at 420, 440, 504.

17. Rosenberg's conduct was in direct contravention of his agreement with Stollenwerck. While Rosenberg was to receive a commission on each of Stollenwerck's trade orders, neither he nor Pro Broker had authorization, written or otherwise, to withdraw other funds from the Gerald Account.[26] *See* Trial Tr. at 49,

24. Rosenberg also admitted to these withdrawals in his response to the CFTC's "First Request for Admissions." *See* Pl.'s Ex. 373, Tabs N and O, ¶¶ B30, 31, 33, 35–36, 38–41, 43, 45, 47–49, 51–54, 56–57, 59, 61, 63–71, 73–75, 77–85, 87–99, 101–07.

25. The remaining $2,628 was made payable to three other parties: (1) a person or entity named "RCF"; (2) J. Walsh, Inc.; and (3) the New York Futures Exchange. *See* Trial Tr. at 294; Pl.'s Exs. 33–47.

26. This Court finds wholly incredible Rosenberg's assertions that he and Stollenwerck had formed a partnership whereby Rosenberg was authorized to use the capital for his personal expenses and that his supposed training of Stollenwerck permitted the use of Stollenwerck's funds. *See* Trial Tr. at 332, 344. In an attempt to support his allegations and to impeach Stollenwerck's testimony, Rosenberg and his only other witness, Peter Griffin, testified to the existence of: (1) a trading group, consisting of Rosenberg, Stollenwerck, Peter Griffin, and Jonathan Stone, *see* Trial Tr. at 359, 398, Def.'s Ex. 1 at 53–54, 182, 206–07; Pl.'s Ex. 364 at 26–27, 43; (2) Stollenwerck's knowledge of Stone's European "Franzi Account," *see* Trial Tr. at 359; Def.'s Ex. 1 at 55–63; Pl.'s Ex. 364 at 30, 43; and (3) a meeting between Rosenberg, Stollenwerck, Griffin and representatives of the Refco group. *See* Def.'s Ex. 1 at 76–83, 158–163; Pl.'s Ex. 364 at 23–25, 30–31. Even if I credited Rosenberg's testimony, which I most certainly do not, the substance of the testimony and Rosenberg's supporting "evidence" shed absolutely no light on whether a partnership agreement existed between Stollenwerck and Rosenberg.

Moreover, I find that the *de bene esse* deposition testimony of Peter Griffin concerning the alleged "partnership" between Stollenwerck and Rosenberg is not sufficient to sup-

65,429–431, 495–98 (no written partnership agreement and no books kept of account). Stollenwerck and Rosenberg never agreed that the funds could be used to pay Rosenberg's personal expenses; rather, the funds were to be used for the sole purpose of supporting Stollenwerck's personal commodities trading through his supposed account at Gerald, Inc. *See* Trial Tr. at 49, 104, 116–17. At the time of trial, neither Rosenberg nor Pro Broker had returned any of Stollenwerck's funds deposited into the Gerald Account. *See* Trial Tr. at 102, 459; Pl.'s Ex. 373, Tabs N and O, ¶ B138.

18. Following his involvement with Stollenwerck, Rosenberg continued to trade and to advise others in commodity options and futures strategy. *See* Def.'s Ex. 1 (Peter Griffin Dep.) at 66–67.

### D. The Driskills

19. In 1992, Carl Raymond Driskill ("C.Driskill") traded bond futures and options through his broker, Robin Rosenberg at First American Discount Corporation ("First American"). *See* Trial Tr. at 205–06. Knowing that C. Driskill was interested in trading options, the broker, Robin Rosenberg, telephonically introduced C. Driskill to Murray Rosenberg, whom the broker called an options "specialist." *See id.* at 206–08. This conference call occurred after the First American broker assured C. Driskill that he would not be charged additional fees for the referral to Murray Rosenberg. *See id.* at 207.

20. Soon thereafter, C. Driskill and Rosenberg engaged in "extended conversations about various options and various strategies" involving C. Driskill's account at First American. *See* Trial Tr. at 208. In these conversations, which occurred daily for a period of six to eight months, Rosenberg discussed his previous work experience with the Chicago Board of Trade and sent C. Driskill various brochures from the conferences at which he lectured. *See id.* at 211–12. C. Driskill testified that he "came to believe in [Rosenberg]." *Id.* at 211.

21. After the funds in his First American account were depleted, C. Driskill continued to discuss trading strategies with Rosenberg. *See* Trial Tr. at 210. At some point in the course of these discussions, Rosenberg suggested that the two form a partnership and sent C. Driskill draft articles of partnership. *See* Trial Tr. at 214–16; Pl.'s Exs. 319, 334. After C. Driskill rejected the idea of a general partnership, the two agreed upon the corporate form, and on January 11, 1994, Rosenberg caused the incorporation of the "Telephony Hedgefund, Ltd." ("Telephony"). *See* Trial Tr. at 217, 221–24; Pl.'s Exs. 320, 333. C. Driskill, his son, Raymond Kent Driskill ("K.Driskill"), and Rosenberg were the

---

port Rosenberg's claim. Although Griffin testified that Stollenwerck had called Rosenberg his "partner," he also testified that he was given very little information and "when it came to [Stollenwerck's] personal relationship and to his business with [Rosenberg], I was walled up." Def.'s Ex. 1 at 42. Furthermore, Griffin testified that he "viewed their situation as a partnership. They never referenced anything to me as to anything more than just being a team. Now, how you want to classify a team is your interpretation. I interpreted it that they worked together." *Id.* at 43. In sum, Griffin's clear admissions that he was not privy to the details of Stollenwerck and Rosenberg's working relationship and that the alleged "partnership" was merely his personal interpretation of Stollenwerck and Rosenberg's relationship, leaves this Court

unpersuaded of a partnership between the two men.

Considering Rosenberg's complete lack of credibility and the absence of any supporting testimony or documentation, I cannot find that the type of agreement advanced by Rosenberg, granting him free reign on the trading and monies contained in the Gerald Account, existed with Stollenwerck. At best, the evidence supports a finding that after approximately six months of receiving free advice about commodity futures and options on futures strategy from Rosenberg, Stollenwerck agreed to place his trades through Rosenberg's corporation, Pro Broker, and to pay a two dollar commission rate. The evidence does not support a finding that Stollenwerck agreed to finance over $200,000 of Rosenberg's personal expenses.

sole shareholders and officers of Telephony. *See* Pl.'s Ex. 366 (K. Driskill Dep.) at 42 (stating that Rosenberg was the President of Telephony, C. Driskill was the Secretary/Treasurer, and K. Driskill was the Vice–President).

22. The purpose of founding Telephony was to trade stock options for the benefit of Telephony's three shareholders. *See* Trial Tr. at 225; Pl.'s Ex. 366 at 42. The Driskills and Rosenberg hoped that Telephony could one day serve as a mutual fund or index on the Philadelphia Stock Exchange. *See* Trial Tr. at 224–25; Pl.'s Ex. 366 at 42–43. The shareholders agreed Telephony's funds were to be used only for trading and were to be held in the primary corporate account, or as C. Driskill called it, the "A Account." *See* Trial Tr. at 226, 249; Pl.'s Ex. 366 at 44. If the shareholders wished to have personal trading accounts, the individual funds were to be held separately, in "B" and "C Accounts." *See* Trial Tr. at 226; Pl.'s Ex. 366 at 69. Because of his prior experience, Rosenberg was charged with trading Telephony's funds, *see* Pl.'s Ex. at 44, while C. Driskill personally funded the trading account. *See* Trial Tr. at 237; Pl.'s Ex. 366 at 43.

23. Per Rosenberg's instructions, C. Driskill wired $15,000 of the Telephony funds, which he originally had deposited, to Rosenberg's corporation, Pro Broker. *See* Trial Tr. at 227–48, 307; Pl.'s Exs. 317, 318, 324. The Driskills believed that this money would be used to set up Telephony's trading account for the purpose of trading stocks and options. *See* Trial Tr. at 248; Pl.'s Ex. 366 at 43–44.

24. K. Driskill also sent Rosenberg money for Rosenberg to place trades for K. Driskill separate and apart from Telephony. *See* Pl.'s Ex. 366 at 53. Rosenberg told K. Driskill that his $1200, sent by K. Driskill to Pro Broker pursuant to Rosenberg's request, would be held in a "B Account," or segregated from Telephony's funds. *See id.* at 54, 67–68. After he sent the personal check to Rosenberg's home address, K. Driskill began to place trade orders through Rosenberg who would confirm the options trades through return telephone calls. *See id.* at 69–72. K. Driskill kept a written record or "calendar" of the trades he believed Rosenberg had executed on his behalf. *See id.* at 77–78.

25. Despite their repeated requests for information, neither C. Driskill nor K. Driskill ever received account statements from Rosenberg. *See* Trial Tr. at 252–53; Pl.'s Ex. 366 at 72–74. Rosenberg has admitted that there were never separate A and B accounts, *see* Trial Tr. at 467, and that he and Pro Broker used portions of the Driskills' money for his personal expenses and business expenses other than trading options. *See id.* at 467–69 (testifying that he used the monies for "groceries, electricity and so forth"); *see also* Pl.'s Ex. 373, Tabs U and V ("Plaintiff's Third Request for Admissions to Pro–Broker Service, Inc. [sic]" and Answer) at ¶ 20.

26. In fact, Rosenberg diverted the vast majority of the Driskills' investment funds in a series of transfers. Of the $16,200 originally sent to Pro Broker by both Driskills, Rosenberg only transferred $10,000 to trading accounts which, unsurprisingly, were held in Rosenberg's own name. *See* Pl.'s Exs. 216, 311, 351, 411; Trial Tr. at 309. Of this $10,000, Rosenberg diverted at least $9,754.91 to his personal use. *See* Pl.'s Exs. 214, 312, 341, 343, 349, 351, 354, 411; Trial Tr. at 310. Of the $6,200 remaining in the Pro Broker account, Rosenberg caused four separate checks to be written to Rosenberg and his wife, Margaret McBride Rosenberg, totaling $3800. *See* Pl.'s Ex. 216, 219, 247, 250, 251, 411; Trial Tr. at 308–09. In sum, Rosenberg diverted $13,554.91, or about eighty-four percent of the funds wired by the Driskills.

27. Neither Rosenberg nor Pro Broker had authorization from the Driskills to use the Telephony or the K. Driskill personal funds for expenses, personal, business, or otherwise. *See* Trial Tr. 248–250; Pl.'s

Ex. 366 at 44, 67–68 (K. Driskill testifying that Telephony funds were not to be used for anything other than trading and his personal $1200 was to be used for trading); Pl.'s Ex. 373, Tabs U and V at ¶¶ 36–37.

28. Both Driskills demanded that Rosenberg return their money. *See* Trial Tr. 254; Pl.'s Ex. 366 at 76. Rosenberg returned $6800 to C. Driskill and refused to return the balance. *See* Trial Tr. 253–56, 258. Similarly, Rosenberg returned only a portion of what K. Driskill believed to be his account balance. *See* Pl.'s Ex. 366 at 76–77.

## III. CONCLUSIONS OF LAW

### A. Violations of the Commodities Exchange Act and Supporting Regulations

1. *Rosenberg Committed Futures and Options Fraud in Violation of 7 U.S.C. §§ 6b(a),6c(b) and 17 U.S.C. § 33.10*

1. This case is governed by two separate anti-fraud provisions of the CEA, namely section 4b(a), governing futures contracts, and section 4c(b), in conjunction with 17 C.F.R. § 33.10, governing options contracts. Because Stollenwerck and Rosenberg dealt in both commodity futures and options on futures, both provisions will be analyzed together. For the reasons set forth below, I find that Rosenberg has violated both provisions.

2. Section 4b(a) of the CEA makes it unlawful for any person to deceive or defraud another person "in or in connection with any order to make, or the making of, any contract of sale of any commodity ... for future delivery...." [27] 7 U.S.C. § 6b(a)(i)-(iii)(1999); *see also Saxe v. E.F. Hutton & Co., Inc.*, 789 F.2d 105, 109 (2d Cir.1986). The ban on options fraud involves a two-step process: section 4c(b) [28] of the CEA prohibits option transactions "contrary to any rule, regulation, or order of the Commission" while the regulations promulgated thereunder make it unlawful for any person to deceive or defraud another "in or in connection with an offer to enter into, the entry into, the confirmation of the execution of, or the

27. Section 4b of the CEA provides, in relevant part:

It shall be unlawful (1) for any member of a contract market, or for any correspondent, agent, or employee of any member, in or in connection with any order to make, or the making of, any contract of sale of any commodity in interstate commerce, made, or to be made, on or subject to the rules of any contract market, for or on behalf of any other person, or (2) for any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery, made, or to be made, for or on behalf of any other person if such contract for future delivery is or may be used for (A) hedging any transaction in interstate commerce in such commodity or the products or byproducts thereof, or (B) determining the price basis of any transaction in interstate commerce in such commodity, or (C) delivering any such commodity sold, shipped, or received in interstate commerce for the fulfillment thereof-
 (i) to cheat or defraud or attempt to cheat or defraud such other person;
 (ii) willfully to make or cause to be made to such other person any false report or statement thereof, or willfully to enter or cause to be entered for such person any false record thereof;
 (iii) willfully to deceive or attempt to deceive such other person by any means whatsoever in regard to any such order or contract or the disposition or execution of any such order or contract, or in regard to any act of agency performed with respect to such order or contract for such person....
7 U.S.C. § 6b(a)(i)-(iii)(1999).

28. Section 4c(b) of the CEA provides, in relevant part:

No person shall offer to enter into, enter into or confirm the execution of, any transaction involving any commodity regulated under this chapter which is of the character of, or is commonly known to the trade as, an "option" ..., contrary to any rule, regulation, or order of the Commission prohibiting any such transaction or allowing any such transaction under such terms and conditions as the Commission shall prescribe.
7 U.S.C. § 6c(b)(1999).

maintenance of, any commodity option transaction." 17 C.F.R. § 33.10 (1999).[29]

3. Judicial and agency interpretations of these statutes are inconsistent and far from clear. In *Commodity Futures Trading Comm'n v. American Metals Exch. Corp.*, 693 F.Supp. 168 (D.N.J.1988)("*American Metals I* "), Judge Ackerman held that to establish a fraud claim in an enforcement action under the CEA, the CFTC must demonstrate: (1) a material misrepresentation of presently existing or past fact; (2) knowledge of the falsity by the person making the misrepresentation; (3) intent that the misrepresentation be relied upon; and (4) reliance on the misrepresentation. *See id.* at 194. Subsequently, in *Commodity Futures Trading Comm'n v. American Metals Exch. Corp.*, 775 F.Supp. 767, 774 (D.N.J.1991)(Ackerman, J.), *aff'd in part, vacated in part on other grounds*, 991 F.2d 71 (3d Cir.1993)("*American Metals II* "), Judge Ackerman followed his earlier opinion and held that reliance was an essential element of fraud in an enforcement action under the CEA. *See id.* at 774–775. In so holding, Judge Ackerman noted the absence of any agency case law on the issue of reliance and found the fraud provision of the Securities Exchange Act of 1934, Rule 10b–5, which does not require a finding of reliance, distinguishable. *See American Metals II*, 775 F.Supp. at 774.

4. Agency law has evolved since the *American Metals* line of cases, clearly holding that customer reliance on material misrepresentations need not be proven in an enforcement action alleging fraud. *See Matter of Staryk*, No. 95–5 (C.F.T.C. Dec. 18, 1997); *In re JCC, Inc., et al.*, No. 89–4, 1994 WL 183817, at *6 n. 17 (C.F.T.C. May

12, 1994), *aff'd, JCC, Inc. v. Commodity Futures Trading Comm'n*, 63 F.3d 1557 (11th Cir.1995); *In re GNP Commodities, Inc., et al.*, No. 89–1, 1992 WL 201158, at *16 (C.F.T.C. August 11, 1992), *aff'd in part and modified sub nom., Monieson v. Commodity Futures Trading Comm'n*, 996 F.2d 852 (7th Cir.1993). In making this policy determination, the CFTC, in direct opposition to Judge Ackerman, analogized the CEA fraud provisions to Rule 10b–5 and reasoned that, like proceedings brought by the Securities Exchange Commission, CFTC proceedings are brought to protect the public interest and not to redress private wrongs. *See In re GNP Commodities, Inc.*, 1992 WL 201158, at *16. The CFTC also distinguished the injunctive nature of the *American Metals* proceeding, noting in dicta that "proof of reliance may have relevance" in ancillary equitable relief secured for the benefit of defrauded customers. *See id.* Recently, two district courts held that reliance is not an essential element of commodities fraud. *See Commodity Futures Trading Comm'n v. AVCO Fin. Corp.*, 28 F.Supp.2d 104, 115 (S.D.N.Y.1998)("to establish the fraud element of a § 6b(a)(i) charge, it must be established that Defendants made a material misrepresentation with scienter"); *Commodity Futures Trading Comm'n v. Commonwealth Fin. Group, Inc.*, 874 F.Supp. 1345, 1355 (S.D.Fla.1994)("in an enforcement proceeding under section 4b(A) of the Act, reliance by customers is irrelevant").

5. In light of the CFTC decisions regarding the issue of reliance in enforcement actions, I find it appropriate to defer to the agency's clear policy determination and its permissible construction of the

---

**29.** 17 C.F.R. § 33.10 provides:

It shall be unlawful for any person directly or indirectly:

 (a) To cheat or defraud or attempt to cheat or defraud any other person;

 (b) To make or cause to be made to any other person any false report or statement thereof or cause to be entered for any person any false record thereof;

 (c) To deceive or attempt to deceive any other person by any means whatsoever in or in connection with an offer to enter into, the entry into, the confirmation of the execution of, or the maintenance of, any commodity option transaction.

statutory scheme it is entrusted to administer. *See Chevron, USA Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 834–844, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984). Accordingly, I find that to establish a claim for futures and options fraud under section 4b(a) and 4c(b) of the CEA in an enforcement action, the CFTC must demonstrate that the defendant made a material misrepresentation of presently existing or past fact with scienter. *See AVCO Financial Corp.,* 28 F.Supp.2d at 115.

6. Enforcement cases brought by the agency are clearly distinguishable from actions brought by private actors against alleged violators of the CEA. In such cases, reliance is relevant to the causation element of the plaintiff's fraud claim to recover damages. *See e.g.,* 7 U.S.C. § 9 (1999)(providing that the CFTC can "require restitution to customers of damages proximately caused by violations of such persons"); *Indosuez Carr Futures, Inc. v. Commodity Futures Trading Comm'n,* 27 F.3d 1260, 1264 (7th Cir.1994)(stating that "to recover, an investor must show that it is more likely than not that her losses were proximately caused by the misrepresentations ... in other words, that she relied on the misrepresentations"); *In re Staryk,* 1997 WL 778236, at *13 ("reliance is a statutory requirement of restitution"); *In re JCC, et al.,* 1994 WL 183817, at *6 n. 17 ("the customer must prove, in order to prevail, that he relied on the misrepresentations he is alleging").

■■■■ 7. Because the CFTC is seeking restitution, ostensibly to compensate Stollenwerck, this case is an amalgam of an enforcement action and one brought by a private litigant for damages. Yet, the issues are easily separated into the elements necessary to establish commodity futures and options fraud and those essential to recover the desired relief. More than a mere technical distinction, I find that customer reliance on the defendant's misrepresentation is not a necessary element of the CFTC's case in an enforcement action,

but is essential to restitution relief sought to compensate the injured party. Accordingly, I shall address the issue of reliance for purposes of the CFTC's requested relief. I shall now turn to the elements of the CFTC's fraud claims.

■■■■ 8. First, Rosenberg made numerous material misrepresentations. "[A] statement is material if there is a substantial likelihood that a reasonable investor would consider it important in making an investment decision." *Saxe v. E.F. Hutton & Co., Inc.,* 789 F.2d 105, 109 (2d Cir. 1986); *see also Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1485 (6th Cir.1989)(Milburn, J., concurring); *Commodity Futures Trading Comm'n v. Commonwealth Fin. Group, Inc.,* 874 F.Supp. 1345, 1354 (S.D.Fla.1994). Rosenberg's misrepresentations can be grouped into three general categories, including: (1) the promise to open a trading account at Gerald, Inc. in Stollenwerck's name and the subsequent solicitation of funds; (2) the reporting of erroneous account balances; and (3) the unlawful trading activity.

9. As this Court noted in its findings of fact, Rosenberg misrepresented that he would set up a trading account for Stollenwerck at Gerald, Inc. *See* Findings of Fact at ¶ 7. Rosenberg only opened a trading account in his own name, maintaining exclusive control over all aspects of the account. *See id.* at ¶ 9. Second, Rosenberg regularly overstated the account's balance to Stollenwerck. Specifically, Rosenberg reported the existence of trading profits when no profits had been earned and failed to report both the losses on trades Stollenwerck had not authorized Rosenberg to make and his numerous withdrawals of Stollenwerck's money from the Gerald Account. *See id.* at ¶¶ 14–16. Moreover, Rosenberg prepared and sent false 1099 tax forms for the 1993 and 1994 tax years. *See id.* at ¶¶ 12, 15. Finally, Rosenberg not only confirmed trade orders submitted by Stollenwerck that Rosenberg had failed to execute but he also engaged in unauthorized trading. *See id.* at ¶¶ 14–16.

10. This Court concludes that all of the above misrepresentations constitute information that a reasonable investor would consider important in trading commodity futures and options on futures. Accordingly, I find that Rosenberg's misrepresentations were "material" and fall under the rubric of the CEA's anti-fraud provisions. *See e.g., Crothers v. Commodity Futures Trading Comm'n,* 33 F.3d 405, 409 (4th Cir.1994)(finding unauthorized trading a violation of CEA anti-fraud futures provision); *Commodity Futures Trading Comm'n v. Muller,* 570 F.2d 1296. 1300 (5th Cir.1978)(finding evidence that defendant lied concerning opening of bank account and supplied fictitious options trade statements was sufficient to support injunction); *Commodity Futures Trading Comm'n v. McLaurin,* No. 95–C–285, 1996 WL 385334, at *4 (N.D.Ill. July 3, 1996)(finding defendant submitted fraudulent reports and statements in violation of the CEA); *Commodity Futures Trading Comm'n v. Skorupskas,* 605 F.Supp. 923, 932–33 (E.D.Mich.1985)(finding that defendant's failure to open trading account, failure to make trades in accordance with her representations, and issuance of false monthly statements constituted fraud in violation of CEA); *Kelley v. Carr,* 567 F.Supp. 831, 837–38 (W.D.Mich.1983)(finding defendant engaged in unauthorized trading in violation of CEA).

■ 11. This Court also concludes that Rosenberg made the misrepresentations with the requisite degree of scienter. The term "scienter" refers to a mental state embracing an intent to deceive, manipulate, or defraud. *See Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976); *see also AVCO Fin. Corp.,* 28 F.Supp.2d at 116. In this District, one of my colleagues has held that to make out a fraud claim under the CEA, "plaintiffs need not show that defendants acted with an evil motive or an intent to injure," *see American Metals I,* 693 F.Supp. at 194, rather, "recklessness is sufficient to satisfy the scienter require-

ment. . . ." *American Metals II,* 775 F.Supp. at 775. In this case, the more lenient recklessness standard is unnecessary since there is overwhelming evidence that Rosenberg's misrepresentations were made intentionally and with knowledge of their falsity. As was determined by this Court in the findings of fact, Rosenberg instructed Stollenwerck to wire funds to Gerald Account No. 827–82715 for the benefit of Pro Broker when he knew that the account was in fact in Rosenberg's name alone. *See* Findings of Fact at ¶¶ 9–10. Moreover, the evidence shows that Rosenberg confirmed Stollenwerck's trades when he knew he had not executed them, and that the 1099 tax forms Rosenberg sent to Stollenwerck did not accurately reflect the monthly confirmation statements he had been receiving from Gerald, Inc. *See id.* at ¶¶ 14–16. Finally, as set forth above, the CFTC offered evidence of Rosenberg's similar "trading" conduct with the Driskills as evidence that Rosenberg intended to defraud Stollenwerck. *See id.* at ¶¶ 19–28. Accordingly, the CFTC has established that Rosenberg acted with scienter.

12. I also find that Rosenberg's misrepresentations were made "in connection with" commodity futures and options trading within the meaning of the CEA. While it is undisputed that Rosenberg traded in commodity futures and options on futures with Stollenwerck's money, it is also true that all of the misrepresentations involved the trading relationship between Rosenberg and Stollenwerck. For those reasons, I find that the misrepresentations meet the statutory "in connection with" requirement.

■ 13. Finally, and for purposes of supporting their request for restitution, the CFTC has sufficiently proven that Stollenwerck relied on Rosenberg's misrepresentations. For instance, as reflected in my findings of fact, Stollenwerck wired the monies to fund what he believed was his account at Gerald, Inc. because Rosenberg had explicitly told him that he

would set up an account for Stollenwerck in Stollenwerck's name. *See* Findings of Fact at ¶¶ 7, 10. Furthermore, Stollenwerck continued to deposit monies because, based in part upon his conversations with Rosenberg, he thought that his account at Gerald was "doing great." *See id.* at ¶ 11. Moreover, in reliance on their veracity, Stollenwerck submitted to the Internal Revenue Service the 1099 tax forms he received from Rosenberg and Pro Broker. *See id.* at ¶ 12. In sum, there is ample evidence to support a finding of reliance in this case.

14. For the reasons set forth above, I find that Rosenberg has committed futures and options fraud in violation of sections 4b(a) and 4c(b) of the CEA, 7 U.S.C. §§ 6b(a), 6c(b)(1999), and the regulations promulgated thereunder.

### 2. *Rosenberg Did Not Convert Stollenwerck's Money With Criminal Intent in Violation of 7 U.S.C. § 13(a)(1 )*

■ 15. Section 9(a)(1) of the CEA makes it a felony to convert, with criminal intent, a customer's money having a value in excess of $100 which was received to secure trades for that customer. *See* 7 U.S.C. § 13(a)(1)(1999); [30] *see also Commodity Futures Trading Comm'n v. Prism Fin. Corp.*, No. 96–D–389, 1996 WL 523349, at *1 (D.Co. April 5, 1996); *Commodity Futures Trading Comm'n v. Dominick*, No. 94–661–CIV–ORL–18, 1996 WL 406833, at *5 (M.D.Fla. Mar.30, 1996). The crime of conversion is punishable by a fine of not more than $1,000,000 (or $500,-000 in the case of an individual), imprisonment for not more than five years, or both, together with the costs of prosecution. *See* 7 U.S.C. § 13(a) (1999). In this case, I intimate no view regarding whether Rosenberg committed criminal conversion in violation of 7 U.S.C. § 13(a)(1) since he was not afforded the traditional Due Process rights guaranteed to defendants in a criminal prosecution. For example, Rosenberg was not provided an attorney or a jury of his peers. Consequently, it would be inappropriate for this Court to make any finding concerning whether or not Rosenberg acted, beyond a reasonable doubt, with criminal intent.

### 3. *Rosenberg Failed to Register as a Futures Commission Merchant and Unlawfully Commingled Funds in Violation of 7 U.S.C. §§ 6d(1)-(2)*

■ 16. At trial, the CFTC introduced evidence that Rosenberg and Pro Broker violated section 4d of the CEA by failing to register as either a futures commission merchant ("FCM") or "introducing broker" and by unlawfully commingling customer funds with his own. For the reasons set forth below, I find that Rosenberg and Pro Broker were in fact an unregistered FCM and commingled Stollenwerck's funds with their own in the Gerald Account.

17. Section 4d of the CEA and its supporting regulations make it unlawful for any person to solicit or accept orders as an FCM or introducing broker without regis-

---

**30.** 7 U.S.C. § 13(a) provides, in relevant part:
It shall be a felony punishable by a fine of not more than $1,000,000 (or $500,000 in the case of a person who is an individual) or imprisonment for not more than five years, or both, together with the costs of prosecution, for:
(1) Any person registered or required to be registered under this chapter, or any employee or agent thereof, to embezzle, steal, purloin, or with criminal intent convert to such person's use or to the use of another, any money, securities, or property having a value in excess of $100, which was received by such person or any employee or agent thereof to margin, guarantee, or secure the trades or contracts of any customer or accruing to such customer as a result of such trades or contracts or which otherwise was received from any customer, client, or pool participant in connection with the business of such person. The word "value" as used in this paragraph means face, par, or market value, or cost price, either wholesale or retail, whichever is greater.
7 U.S.C. § 13(a)(1) (1999).

tering as such. *See* 7 U.S.C. § 6d(1)(1999);[31] 17 C.F.R. § 33.3(b)(1999).[32] Thus, to find that Rosenberg violated the registration provisions of the CEA, this Court must first determine whether Rosenberg meets the statutory definitions of either "futures commission merchant" or "introducing broker."

**31.** Section 4(d) of the CEA provides, in relevant part:

> It shall be unlawful for any person to engage as futures commission merchant or introducing broker in soliciting orders or accepting orders for the purchase or sale of any commodity for future delivery, or involving any contracts of sale of any commodity for future delivery, on or subject to the rules of any contract market unless-
> (1) such person shall have registered, under this chapter, with the Commission as such futures commission merchant or introducing broker and such registration shall not have expired nor been suspended nor revoked; and
> (2) such person shall, if a futures commission merchant, whether a member or nonmember of a contract market, treat and deal with all money, securities, and property received by such person to margin, guarantee, or secure the trades or contracts of any customer of such person, or accruing to such customer as the result of such trades or contracts, as belonging to such customer. Such money, securities, and property shall be separately accounted for an shall not be commingled with the funds of such commission merchant or be used to margin or guarantee the trades or contracts, or to secure or extend the credit, of any customer or person other than the one for whom the same are held....
>
> It shall be unlawful for any person ... that has received money, securities, or property for deposit in a separate account as provided in paragraph (2) of this section, to hold, dispose of, or use any such money, securities, or property as belonging to the depositing futures commission merchant or any person other than the customers of such futures commission merchant.
>
> 7 U.S.C. § 6d(1)-(2).

**32.** 17 C.F.R. § 33.3 provides, in relevant part:

> It shall be unlawful for:
> (1) Any person to solicit or accept orders from an option customer (other than in a clerical capacity) for any commodity option

18. The CEA defines the relevant terms as follows:

> The term "futures commission merchant" means an individual, association, partnership, corporation, or trust that -
>
> (A) is engaged in soliciting or in accepting orders for the purchase or sale of any commodity for future de-

transaction, or to supervise any person or person so engaged, unless such person is:
(i) Registered as a futures commission merchant under the Act, and either:
 (A) Is a member of the contract market on which the option is traded, or
 (B) Is a member of a futures association registered under section 17 of the Act which has adopted rules which the Commission has approved under section 17(j) of the Act and, in addition to the requirements of that section, has determined to provide for the regulation of the commodity option related activity of its member futures commission merchants in a manner equivalent to that required of contract markets under these regulations; or
(ii) Registered as an introducing broker under the Act, and either:
 (A) Is a member of a futures association registered under section 17 of the Act which has adopted rules which the Commission has approved under section 17(j) of the Act, or is a member of a contract market which has adopted rules which the Commission has approved under section 5a(a)(12) of the Act, which, in addition to the requirements of those sections, has determined to provide for the regulation of the commodity option related activity of its member introducing brokers in a manner equivalent to that required of contract markets with respect to their member futures commission merchants under these regulations; or
 (B) Is operating pursuant to a guarantee agreement, and the futures commission merchant which has signed such agreement is a member of a self-regulatory organization that has adopted rules which the Commission has approved that provide for the regulation of the commodity option related activity of the introducing broker in a manner equivalent to that required of contract markets with respect to their member futures commission merchants under these regulations....
17 C.F.R. § 33.3(b)(1)(1999).

livery on or subject to the rules of any contract market; and

(B) in or in connection with such solicitation or acceptance of orders, accepts any money, securities, or property (or extends credit in lieu thereof) to margin, guarantee, or secure any trades or contracts that result or may result therefrom.

The term "introducing broker" means any person (except an individual who elects to be and is registered as an associated person of a futures commission merchant) engaged in soliciting or in accepting orders for the purchase or sale of any commodity for future delivery on or subject to the rules of any contract market who does not accept any money, securities, or property (or extend credit in lieu thereof) to margin, guarantee, or secure any trades or contracts that result or may result therefrom.

7 U.S.C. §§ 1a(12), 1a(14)(1999); *see also* 17 C.F.R. §§ 1.3(p), 1.3(mm)(1999)(defining futures commission merchant and introducing broker). Undoubtedly, the distinction between an FCM and an introducing broker is that an FCM accepts money, securities, or property to secure trades while an introducing broker does not. For the reasons set forth below, I find that Rosenberg and Pro Broker acted as an FCM, and not an introducing broker.

19. In this case, Rosenberg instructed Stollenwerck to wire funds to an account at the registered FCM Gerald, Inc., which, unbeknownst to Stollenwerck, bore Rosenberg's name. *See* Findings of Fact at ¶¶ 8–10. The simple fact that Stollenwerck did not directly deposit his money with Pro Broker but instead wired the funds to Rosenberg's Gerald Account for the benefit of Pro Broker does not place Rosenberg or Pro Broker outside the scope of the statutory definition of an FCM. A finding to the contrary would circumvent the plain language of the CEA since Rosenberg clearly "accept[ed]" Stol-

lenwerck's funds. Moreover, the evidence shows that Rosenberg, through Pro Broker, solicited, accepted, and placed Stollenwerck's commodity futures and options trade orders, created and delivered to Stollenwerck 1099 tax forms from the trading profits and losses in the Gerald account, and never registered with the CFTC. *See id.* at ¶¶ 2–3, 7, 11–12. Accordingly, I find that Rosenberg and Pro Broker meet the definition of a FCM under the provisions of the CEA and further find that Rosenberg's failure to register himself or Pro Broker as such violated 7 U.S.C. § 6d(1). *See Skorupskas,* 605 F.Supp. at 933 (finding defendant violated 7 U.S.C. § 6d where, among other things, commodity investors contributed funds to defendant's corporation); *Commodity Futures Trading Comm'n v. Standard Forex,* No. CV–93–88, 1998 WL 236923, at *7 (E.D.N.Y. Mar. 31, 1998)(defendant violated section 4d when solicited orders by newspaper advertisement and telephone call, placed commodity futures orders, and never registered); *In re Zurich,* No. 82–27, 1986 WL 65997, at *3–4 (C.F.T.C. Sept. 12, 1986)(violation of 7 U.S.C. § 6d where respondents, among other things, provided customers with account statements on respondent letterhead).

■ 20. Subject to exceptions inapplicable to this case, section 4d of the CEA also prohibits an FCM from commingling customer funds. Specifically, 7 U.S.C. § 6d(2) requires the FCM to "treat and deal" with all property received by a customer "as belonging to such customer." *Id.* The provision further requires that "[s]uch money ... shall be separately accounted for and shall not be commingled with the funds of such commission merchant or be used to margin or guarantee the trades or contracts .... of any customer or person other than the one for whom the same are held...." *Id.; see also In re Zurich,* 1996 WL 65997, at *4 (FCM improperly allocated trading profits and losses between customer funds in violation of § 6d(2)). Based upon the findings of fact as set forth above, it is clear

that Rosenberg deposited funds, albeit a small amount, into the Gerald Account, commingling them with Stollenwerck's monies. *See* Findings of Fact at ¶ 16. Accordingly, I find that Rosenberg and Pro Broker violated section 4d(2) of the CEA.

4. *Rosenberg Failed to Provide Statements in Violation of 17 C.F.R. § 1.33(a)-(b) and Failed to Promptly Execute Trades in violation of 17 C.F.R. § 33.9*

 21. Finally, Rosenberg and Pro Broker violated various CEA regulations. First, in violation of 17 C.F.R. § 1.33(a), Rosenberg and Pro Broker failed to furnish written monthly statements to Stollenwerck reflecting the trading activity, balances, and profits and losses of the Gerald Account. *See* Findings of Fact at ¶ 11; *see also* 17 C.F.R. § 1.33 (1999); [33] *In re Farmers Coop. Co.*, No. 99–6, 1999 WL 10041, at *7 (C.F.T.C. Jan. 12, 1999). Moreover, Rosenberg and Pro Broker failed to provide daily written confirmation of each futures and options transaction in violation of 17 C.F.R. § 1.33(b)(1999).[34] *See* Findings of Fact at

**33.** 17 C.F.R. § 1.33(a) provides, in pertinent part:

> Each futures commission merchant must promptly furnish in writing to each commodity customer and to each option customer ... as of the close of the last business day of each month or as of any regular monthly date selected, except for accounts in which there are neither open positions at the end of the statement period nor any changes to the account balance since the prior statement period, but in any event not less frequently than once every three months, a statement which clearly shows:
> (1) For each commodity customer ...
>> (i) The open contracts with prices at which acquired;
>> (ii) The net unrealized profits or losses in all open contracts marked to the market; and
>> (iii) Any customer funds carried with the futures commission merchant; and
>> (iv) A detailed accounting of all financial charges and credits to such customer accounts during the monthly reporting period, including all customer funds and funds on deposit with respect to foreign futures transactions in accordance with § 30.7 of this chapter received from or disbursed to such customer and realized profits and losses; and
> (2) For each option customer ...
>> (i) All commodity options ... purchased, sold, exercised or expired during the monthly reporting period, identified by underlying futures contract or underlying physical, strike price, transaction date, and expiration date;
>> (ii) The open commodity option ... positions carried for such customer as of the end of the monthly reporting period, identified by underlying futures contract or underlying physical, strike price, transaction date, and expiration date;
>> (iii) All open commodity option ... positions marked to the market and the amount each position is in the money, if any;
>> (iv) Any customer funds carried in such customer's account(s); and
>> (v) A detailed accounting of all financial charges and credits to such customer's account(s) during the monthly reporting period ..., premiums charged and received, and realized profits and losses.
> 17 C.F.R. § 1.33(a)(1999).

**34.** 17 C.F.R. § 1.33(b) provides:

> Each futures commission merchant must, not later than the next business day after any commodity futures or commodity option transaction, including any foreign futures or foreign options transactions, furnish:
> (1) To each commodity customer, a written confirmation of each commodity futures transaction caused to be executed by it for the customer.
> (2) To each option customer, a written confirmation of each commodity option transaction, containing at least the following information:
>> (i) The option customer's account identification number;
>> (ii) A separate listing of the actual amount of the premium, as well as each mark-up thereon, if applicable, and all other commissions, costs, fees and other charges incurred in connection with the commodity option transaction;
>> (iii) The strike price;
>> (iv) The underlying futures contract or underlying physical;
>> (v) The final exercise date of the commodity option purchased or sold; and
>> (vi) The date the commodity option transaction was executed.
> (3) To each option customer, upon the expiration or exercise of any commodity option, a written confirmation statement thereof,

¶ 11. Finally, as set forth in the findings of fact, Rosenberg failed to execute all Stollenwerck's trades promptly, a violation of 17 C.F.R. § 33.9(c).[35] *See id.* at ¶ 14.

### B. The Liability of Pro Broker

■ 22. Because Rosenberg was at all times relevant to this litigation acting on behalf of himself and Pro Broker, the corporation is liable under 7 U.S.C. § 4 (1999). That provision provides:

> For the purpose of this chapter, the act, omission, or failure of any official, agent, or other person acting for any individual, association, partnership, corporation, or trust within the scope of his employment of office shall be deemed the act, omission, or failure of such individual, association, partnership, corporation, or trust, as well as of such official, agent, or other person.

*Id.; see also Guttman v. Commodity Futures Trading Comm'n,* 197 F.3d 33, 39 (2d Cir.1999)(stating that liability may be imposed under 7 U.S.C. § 4 if the CFTC shows that: (1) defendant acted as agent of principal when violation of CEA occurred; and (2) agent's actions were within scope of employment); *Commodity Futures Trading Comm'n v. Sidoti,* 178 F.3d 1132, 1135–36 (11th Cir.1999).

23. As set forth in the findings of fact, Rosenberg was, for all intents and purposes, Pro Broker. *See* Findings of Fact at ¶¶ 2–3. He incorporated Pro Broker, which by default, like Rosenberg, was in the business of trading commodity futures and options on futures. *See id.* Rosenberg also was Pro Broker's sole director

and employee, opened its bank account, was the sole signatory on that account, and had the sole authority to withdraw funds from Pro Broker's bank account. *See id.* at ¶ 3. Moreover, Rosenberg instructed Stollenwerck to wire his funds for the benefit of Pro Broker and made numerous withdrawals on behalf of the corporation. *See id.* at ¶¶ 10, 16. For these reasons, I find that in his trading associations with Stollenwerck, Rosenberg was acting as an agent of Pro Broker and within the scope of his employment. Accordingly, pursuant to 7 U.S.C. § 4, I find Pro Broker liable for the acts of Rosenberg.

### C. Relief Requested

24. The CFTC seeks a permanent injunction enjoining Rosenberg and Pro Broker from committing further violations of the CEA charged in this case. Moreover, the CFTC also seeks ancillary relief in the form of a permanent trading prohibition, disgorgement, restitution, and civil monetary penalties. Invoking this Court's "broad discretion to fashion appropriate relief" in a case under the CEA, *see American Metals I,* 693 F.Supp. at 195, I shall permanently enjoin Rosenberg and Pro Broker from committing further violations of the CEA as well as from trading commodity futures and options on futures on behalf of any other person or entity, including, but not limited to, any association, partnership, corporation, or trust. Furthermore, I shall grant the CFTC's demand for restitution in the amount of $265,000.

---

which statement shall include the date of such occurrence, a description of the option involved, and, in the case of exercise, the details of the futures or physical position which resulted therefrom including, if applicable, the final trading date of the contract for future delivery underlying the option.

(4) Notwithstanding the provisions of paragraphs (b)(1) through (b)(3) of this section, a commodity futures or commodity option transaction that is caused to be executed for

a commodity pool need be confirmed only to the operator of the commodity pool.

**35.** 17 C.F.R. § 33.9 provides in relevant part:

It shall be unlawful for any person ... [u]pon acceptance of an order for a commodity option transaction, to fail unreasonably to secure prompt execution of such order or upon rejection of an order to fail to notify the person whose order has been rejected of such rejection....

17 C.F.R. § 33.9(c)(1999).

### 1. *Permanent Injunction*

25. Pursuant to section 6c of the CEA, the CFTC is authorized to institute an action for injunctive relief in federal district court whenever it appears that any person "has engaged, is engaging, or is about to engage in any act or practice constituting a violation of [the CEA] or any rule, regulation, or order thereunder." 7 U.S.C. § 13a–1 (1993);[36] *see also Commodity Futures Trading Comm'n v. Hunt,* 591 F.2d 1211, 1219 (7th Cir.1979). The District Courts also have jurisdiction to enter a permanent injunction "upon a proper showing." 7 U.S.C. § 13a–1(b)(1999). The legal standard for determining whether an injunction should issue is whether, once a violation has been established, there is a reasonable likelihood of future violations. *See American Metals II,* 775 F.Supp. at 787 (citing *Commodity Futures Trading Comm'n v. American Bd. of Trade, Inc.,* 803 F.2d 1242, 1251 (2d Cir.1986); *Hunt,* 591 F.2d at 1220). "While past misconduct does not lead necessarily to the conclusion that there is a likelihood of future misconduct, it is 'highly suggestive of the likelihood of future violations.'" *Hunt,* 591 F.2d at 1220 (quoting *SEC v. Management Dynamics, Inc.,* 515 F.2d 801, 807 (2d Cir.1975)); *see also AVCO Fin. Corp.,* 28 F.Supp.2d at 120; *American Metals II,* 775 F.Supp. at 787; *Skorupskas,* 605 F.Supp. at 942–43. Furthermore, various courts have also looked to the nature of the past misconduct, whether the defendant's business interests place him in a position where future violations are possible, the persistence of the violating conduct, and whether the defendant has maintained that his conduct was blameless to determine whether an injunction is appropriate. *See Hunt,* 591 F.2d at

1220 (collecting cases); *see also Skorupskas,* 605 F.Supp. at 942–43.

26. This Court concludes that permanent injunctive relief is warranted since it is highly probable that Rosenberg and Pro Broker will engage in future violations of the CEA. In this case, Rosenberg engaged in egregiously fraudulent conduct in violation of the CEA and misappropriated well over $200,000 of Stollenwerck's money, using it for his own personal expenses. Throughout the trial, Rosenberg failed to acknowledge the wrongfulness of his conduct, contending that he siphoned the funds pursuant to some type of an agreement with Stollenwerck. According to the testimony of his witness, Peter Griffin, Rosenberg has continued to "advise" others in commodity futures and options trading and this Court has received no evidence indicating that Rosenberg or Pro Broker will cease dispensing this trading advice. Finally, it is clear from the testimony of the Driskills that prior to this action, Rosenberg and Pro Broker engaged in similar fraudulent conduct where Rosenberg lured the Driskills into sending him funds and then converted the monies for his personal use. Considering the totality of these circumstances, it appears highly likely that Rosenberg and Pro Broker will engage in future violations of the CEA if not permanently enjoined. For that reason, pursuant to 7 U.S.C. § 13a–1, I shall enjoin Rosenberg and Pro Broker from future violations of Sections 4b(a), 4c(b), 4d, 9(a)(1) of the CEA as well as 17 C.F.R. §§ 1.33(a)-(b), 33.3(b), 33.9 and 33.10 (1999). I also find it proper to permanently enjoin Rosenberg and Pro Broker from trading on behalf of any other person or entity, including, but not limited

---

**36.** Section 13a–1 provides, in pertinent part: Whenever it shall appear to the Commission that any contract market or other person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of this chapter or any rule, regulation, or order thereunder ... the Commission may bring an action in the proper district court of the United States .... to enjoin such act or practice, or to enforce compliance with this chapter, or any rule, regulation or order thereunder, and said courts shall have jurisdiction to entertain such actions....

7 U.S.C. § 13a–1(a)(1999).

to, any association, partnership, corporation, or trust.

### 2. *Ancillary Equitable Relief: Restitution*

27. In terms of further relief, the CFTC also seeks restitution, disgorgement, and a civil monetary penalty. For the reasons set forth below, I shall only order restitution of $265,000.

28. While restitution "is meant to make the damaged persons whole and compensate them for a defendant's wrongful acts," the disgorgement remedy "is intended to deprive the violator of his ill-gotten gains and to further the deterrence objectives of the CEA." *AVCO Fin. Corp.,* 28 F.Supp.2d at 121. Because there has been no evidence presented regarding any profits made by Rosenberg with Stollenwerck's monies, I find that disgorgement would be an improper remedy. However, considering that Stollenwerck deposited a total of $265,000 in the Gerald Account, this Court concludes that Rosenberg and Pro Broker are jointly and severally liable for restitution in that amount.

29. While this Court has jurisdiction to impose on Rosenberg and Pro Broker a civil monetary penalty of not more than the higher of $100,000 or triple the monetary gain to them for each violation of the CEA, *see* 7 U.S.C. § 13a–1(d)(1)(1999), this Court is cognizant of its duty to "be realistic and not set a figure which is impossible for a defendant to comply with due to lack of monetary resources." *AVCO Fin. Corp.,* 28 F.Supp.2d at 121. Because the testimony in this case suggested that Rosenberg does not have the financial means to pay any amount set by the Court, I shall not impose a civil monetary penalty in this case.

## IV. CONCLUSION

Based upon the findings of fact and conclusions of law set forth above, I find that Rosenberg has violated sections 6b(a), 6c(b), 4d, and 9(a) of the Commodities Exchange Act and many of its supporting regulations. Accordingly, I shall enter a judgment against Rosenberg and Pro Broker in accordance with these Findings of Fact and Conclusions of Law. The Court shall enter an appropriate order.

## ORDER

This matter having come before the Court on the motion of Plaintiff, Commodity Futures Trading Commission ("CFTC"), for reargument of my decision in *Commodity Futures Trading Comm'n v. Rosenberg,* No. 97–2927 (D.N.J. filed May 25, 1999), to exclude from evidence the taped conversations between Mr. James Stollenwerck and the defendant, Murray I. Rosenberg ("Rosenberg"), pursuant to Federal Rule of Evidence 408; and,

This matter having come before the Court on the motion of Rosenberg, to exclude the *de bene esse* deposition testimony of Raymond Kent Driskill and the trial testimony of Carl Raymond Driskill, pursuant to Federal Rule of Evidence 404(b)l; and,

This matter having come before the Court on the Complaint of the CFTC, for Rosenberg's violations of the Commodities Exchange Act; and,

Robert J. Cleary, Esq., United States Attorney, Paul A. Blaine, Esq., Assistant United States Attorney, Matthew Elkan, Esq. and Karen Kenmotsu, Esq. of the Commodity Futures Trading Commission, appearing on behalf of Plaintiff, CFTC; and

Murray Ira Rosenberg, appearing *pro se,* and Gary W. Stuhltrager, Esq. appearing on behalf of Defendant, Pro–Broker Service, Inc.; and,

The Court having considered the submissions of the parties, as well as the evidence presented at trial; and,

The Court having made its findings of fact and conclusions of law as set forth in

the OPINION filed concurrently with this ORDER;

IT IS, on this 1st day of March, 2000, hereby ORDERED that:

1. The motion of the CFTC for reargument is DENIED;

2. The motion of Rosenberg to exclude the testimony of Carl Raymond Driskill and Raymond Kent Driskill is DENIED;

3. Defendants, Murray I. Rosenberg and Pro–Broker Service, Inc., are PERMANENTLY ENJOINED from further violations of sections 4b(a), 4c(b), 4d(1)-(2), 9(a)(1) of the Commodities Exchange Act, 7 U.S.C. §§ 6b(a), 6c(b), 6d(1)-(2), 13(a)(1) (1999) as well as 17 C.F.R. sections 1.33(a)–(b), 33.3(b), 33.9 and 33.10(1999);

4. Defendants, Murray I. Rosenberg and Pro–Broker Service, Inc., are PERMANENTLY ENJOINED from trading commodity futures and options on futures on behalf of any other person or entity, including, but not limited to, any association, partnership, corporation, or trust;

5. Defendants, Rosenberg and Pro–Broker Service, Inc., are hereby ORDERED to pay $265,000 in restitution to the CFTC.